FILED
United States Court of Appeals
Tenth Circuit

October 24, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AMERICAN WILD HORSE
PRESERVATION CAMPAIGN;
CLOUD FOUNDATION; RETURN
TO FREEDOM; CAROL WALKER;
KIMERLEE CURYL; GINGER
KATHRENS,

       Petitioners - Appellants,

v.

SALLY JEWELL, in her official
capacity as Secretary of the United
States Department of the Interior;
NEIL KORNZE, in his official
capacity as Bureau of Land
Management Acting Director,

       Respondents - Appellees.

----------------------

ROCK SPRINGS GRAZING
ASSOCIATION; STATE OF
WYOMING,

       Intervenor Respondents -
       Appellees.

----------------------

NATURAL RESOURCES AND
ADMINISTRATIVE LAW
PROFESSORS; MOUNTAIN STATES
LEGAL FOUNDATION; WYOMING
STOCK GROWERS ASSOCIATION,

       Amici Curiae.

No. 15-8033

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 2:14-CV-00152-NDF)**

William S. Eubanks II, of Meyer Glitzenstein & Eubanks LLP, Fort Collins, Colorado (Katherine A. Meyer of Meyer Glitzenstein & Eubanks, LLP, Washington, D.C., with him on the briefs), for Petitioners-Appellants.

Thekla Hansen-Young, Attorney, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C. (John C. Cruden, Assistant Attorney General; Arthur R. Kleven, Office of the Solicitor, United States Department of the Interior; Andrew C. Mergen, Mark R. Haag, Coby Howell and Jason A. Hill, Attorneys, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., with her on the brief), for Respondents-Appellees.

Constance E. Brooks, of C. E. Brooks & Assoc., P.C., Denver, Colorado (Cody Doig and Danielle Hagen of C. E. Brooks & Assoc. P.C., Denver, Colorado; and Galen West of West Law Office, PC, Rock Springs, Wyoming, with her on the brief), for Intervenor Respondent-Appellee, Rock Springs Grazing Association.

Erik E. Petersen, Office of Wyoming Attorney General, Cheyenne, Wyoming (Michael J. McGrady, Office of Wyoming Attorney General, with him on the brief), for Intervenor Respondent-Appellee, State of Wyoming.

Daniel H. Lutz and Hope M. Babcock of the Institute for Public Representation, Georgetown University Law Center, Washington, D.C., filed an Amicus Brief on behalf of the Amici Curiae Law Professors.

Maegan L. Woita and Steven J. Lechner of the Mountain States Legal Foundation, Lakewood, Colorado, filed an Amicus Brief on behalf of the Wyoming Stock Growers Association and Mountain States Legal Foundation.

Before **BRISCOE, McKAY** and **MATHESON**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Petitioners American Wild Horse Preservation Campaign, The Cloud Foundation, Return to Freedom, Carol Walker, and Kimerlee Curyl filed this action against Sally Jewell, the Secretary of the Department of the Interior, and Neil Kornze, the acting director of the Bureau of Land Management (BLM), seeking review of BLM's decision to remove wild horses in certain areas of public land located in southwestern Wyoming within an area known as the "Checkerboard." Petitioners alleged, in pertinent part, that the removal violated the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–1340, and the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701–1787. The district court rejected these claims. Petitioners now appeal. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the judgment of the district court.

I

*The Wild Free-Roaming Horses and Burros Act*

At the heart of this case is the Wild Free-Roaming Horses and Burros Act (the Act). In Mountain States Legal Found. v. Hodel, 799 F.2d 1423 (10th Cir. 1986), we described the genesis and purpose of the Act:

> Wild horses and burros are the progeny of animals introduced to North America by early Spanish explorers. They once roamed the western rangelands in vast herds. But over time, desirable grazing land was fenced off for private use, while the animals were

slaughtered for sport and profit. The herds began to dwindle, and the
remaining animals were driven to marginal, inhospitable grazing
areas. Alarmed at the decline of these herds, Congress in 1971
enacted the Wild Free-Roaming Horses and Burros Act, 16 U.S.C.
§§ 1331–1340 (1982), to protect the wild horses and burros from
"capture, branding, harassment, or death." 16 U.S.C. § 1331 (1982).
According to congressional findings, these "living symbols of the
historic and pioneer spirit of the West" had been cruelly slain, used
for target practice, and harassed for sport. S. Rep. No. 242, 92d
Cong., 1st Sess., *reprinted in* 1971 U. S. Code Cong. & Ad. News
2149, 2149. Congress also found that the wild horses and burros had
been exploited by commercial hunters who sold them to
slaughterhouses for the production of pet food and fertilizer. Id.; see
also Johnston, The Fight to Save a Memory, 50 Texas L. Rev. 1055,
1056–57 (1972).

Established under authority granted Congress by the Property Clause
of the Constitution, the Act declares wild horses and burros to be an
"integral part of the natural system of the public lands," 16 U.S.C.
§ 1331 (1982), and mandates that the animals be managed "as
components of the public lands." 16 U.S.C. § 1333(a).

Id. at 1425 (footnote omitted). In short, the Act "is nothing more than a land-use

regulation enacted by Congress to ensure the survival of a particular species of

wildlife." Id. at 1428.

*BLM and its management obligations*

In the Act, Congress designated BLM to oversee the management of wild

horses and burros on public lands. BLM manages wild horses on public lands

within what it calls designated herd management areas (HMAs). 43 C.F.R.

§ 4710.3-1. HMAs and their boundaries are established by BLM in Resource

Management Plans (RMPs). RMPs are prepared through a land-use planning

process conducted pursuant to the Federal Land Policy and Management Act of

4

1976 (FLPMA), 43 U.S.C. §§ 1701–1787. To comply with the Act's directive to manage wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands," 16 U.S.C. § 1333(a), BLM maintains a current inventory of wild horses in each HMA; determines the appropriate management level (AML) of wild horses that each HMA can sustain; and determines the method of achieving the designated AML. 16 U.S.C. § 1333(b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1.

An AML is "expressed as a population range," with both "an upper and lower limit," "within which [wild horses or burros] can be managed for the long term." Aplt. App. at 115. "The AML upper limit shall be established as the maximum number of [wild horses and burros] which results in a [thriving natural ecological balance] and avoids a deterioration of the range" at issue. Id. "The AML lower limit shall normally be established at a number that allows the population to grow (at the annual population growth rate) to the upper limit over a 4–5 year period, without any interim gathers to remove excess [wild horses and burros]." Id.

*Sections 3 and 4 of the Act*

Two sections of the Act are relevant here. Section 3 of the Act requires BLM, in pertinent part, to "maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands" in order to "make determinations as to whether and where an overpopulation exists and whether

5

action should be taken to remove excess animals," as well as to "determine whether appropriate management levels should be achieved by the removal or destruction of excess animals." 16 U.S.C. § 1333(b)(1). If BLM "determines . . . that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals," it must "immediately remove excess animals from the range so as to achieve appropriate management levels."[1] 16 U.S.C. § 1333(b)(2). Generally speaking, BLM does not remove animals below the AML lower limit except in emergency situations or where there are "[e]scalating problems" that "indicate additional animals need to be removed to protect land health, wildlife habitat and the health of horses and burros remaining on the public land." Aplt. App. at 203.

The second relevant section of the Act is Section 4. It provides as follows:

> If wild free-roaming horses or burros stray from public lands onto privately owned land, the owners of such land may inform the nearest Federal marshal or agent of the Secretary, who shall arrange to have the animals removed. In no event shall such wild free-roaming horses and burros be destroyed except by the agents of the Secretary. Nothing in this section shall be construed to prohibit a private landowner from maintaining wild free-roaming horses or

---

[1] Section 3 of the Act prescribes how the BLM is to carry out this removal process. First, "old, sick, or lame animals [are] to be destroyed in the most humane manner possible." 16 U.S.C. § 1333(b)(2)(A). Then, BLM is to "humanely capture[] and remove[] for private maintenance and care" "such number of additional excess" animals for which BLM "determines an adoption demand exists by qualified individuals." 16 U.S.C. § 1333(b)(2)(B). Lastly, BLM "shall cause additional excess wild free-roaming horses and burros . . . to be destroyed in the most humane and cost efficient manner possible." Id. § 1333(b)(2)(C).

6

burros on his private lands, or lands leased from the Government, if he does so in a manner that protects them from harassment, and if the animals were not willfully removed or enticed from the public lands. Any individuals who maintain such wild free-roaming horses or burros on their private lands or lands leased from the Government shall notify the appropriate agent of the Secretary and supply him with a reasonable approximation of the number of animals so maintained.

16 U.S.C. § 1334.

### *The Checkerboard*

The dispute at issue in this case stems from actions occurring in an area of southwestern Wyoming known as the "Checkerboard." See Exhibit A (map of Checkerboard). The Checkerboard, which "comprises over one million acres of generally high desert land," "derives its name from the pattern of alternating sections of private and public land which it comprises." Mountain States Legal Found., 799 F.2d at 1424, n.1. "The checkerboard scheme of land ownership is a result of the Union Pacific Act passed in 1862." Id. at 1424 n.1. "Under the [Union Pacific] Act, the Union Pacific Railroad Company was awarded the odd-numbered lots of public land along the railbed right-of-way," extending back approximately twenty miles on each side of the railbed, "as the company completed each mile of the transcontinental railroad." Id. "By granting to the railroad the odd-numbered sections, and retaining the even-numbered sections, a checkerboard effect resulted." Leo Sheep Co. v. United States, 570 F.2d 881, 885 (10th Cir. 1977), rev'd, 440 U.S. 668 (1979). "With some exceptions, odd-

7

numbered sections were surrounded on all four sides by even-numbered sections which were part of the public domain." Id. "Similarly, even-numbered sections owned by the Government as public land were also generally surrounded on all four sides by odd-numbered sections granted to the railroad." Id. "Today, more than half of the [C]heckerboard remains under federal ownership, while the remainder is held privately." Mountain States, 799 F.2d at 1424 n.1. Notably, Congress has long prohibited private land owners within the Checkerboard from constructing fences that effectively fence in public rangeland. See 43 U.S.C. §§ 1061–65. When wild, free-roaming horses are added to this equation of adjoining, unfenced parcels of lands held in alternating public and private ownership, the complexity of enforcing Sections 3 and 4 of the Act becomes apparent.

*Rock Springs Grazing Association*

Within the Checkerboard is an area known as the Rock Springs District. This area of the Checkerboard, which is approximately 40 miles wide and 115 miles long, is managed by the Rock Springs Grazing Association (RSGA). RSGA, which was established in 1908, uses this area of the Checkerboard primarily for grazing sheep in the winter. Given the checkerboard land pattern, RSGA manages its private lands in concert with the unfenced public lands. RSGA's livestock "roam freely on property owned by [RSGA] and on the alternate sections of land owned by the federal government." Mountain States,

8

799 F.2d at 1424. "[W]ild horses also roam these lands." Id. Because the Checkerboard is not fenced, horses and other livestock roam freely between the parcels of private and public land.

In 1977, RSGA invoked its rights under Section 4 of the Act and asked that wild horses be removed from its private lands within the Checkerboard. BLM acknowledged RSGA's request, but took no action on it.

In 1979, RSGA agreed, as a result of meeting with two wild horse advocacy groups, to tolerate 500 wild horses on the Checkerboard and a total of 1,500 wild horses within the entire Rock Springs District, subject to BLM proving capable of managing the wild horse populations.

*Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs*

Three HMAs are at issue in this lawsuit: Adobe Town, Salt Wells Creek, and Great Divide Basin. All three fall partly within the Checkerboard. The three are comprised of approximately 70% federally administered public lands and approximately 30% private lands. The private lands are owned or leased by RSGA. The non-Checkerboard lands within these three HMAs (i.e., the portions falling outside the Checkerboard) comprise over half of the total land area in these HMAs and primarily consist of large contiguous blocks of public land.

Livestock owners in these three HMAs are permitted by the provisions of the Taylor Grazing Act of 1934, 43 U.S.C. § 315 *et seq.*, to graze their sheep and cattle on the Checkerboard's public lands at rates far below market value for such

9

forage.

*The 1981 Court Order and BLM's response*

In 1979, RSGA filed suit against BLM in federal court alleging that BLM failed to comply with Sections 3 and 4 of the Act. More specifically, RSGA alleged that BLM failed to remove wild horses from the RSGA's private lands and prevent damage to those lands. In 1981, the federal district court overseeing the action ordered BLM to "remove all wild horses from the checkerboard grazing lands in the Rock Springs District except that number which the [RSGA] voluntarily agree[d] to leave in said area." Rock Springs Grazing Ass'n v. Salazar, 935 F. Supp. 2d 1179, 1183 (D. Wyo. 2013) (quotation marks omitted). With the consent of the RSGA, BLM subsequently designated AMLs for each of the HMAs that fell within RSGA's grazing lands. BLM did not, however, remove wild horses down to the upper limits of those AMLs until 1985, when RSGA moved to enforce the district court's 1981 order. At that time, BLM shifted its approach from rounding up wild horses under Section 4 of the Act to generally maintaining wild horses at the agreed-upon AMLs under Section 3 of the Act.

*The 2003 and 2013 consent decrees*

In 2003, the State of Wyoming sued BLM to enforce the AMLs previously agreed to by BLM. The parties resolved that suit by entering into a consent decree that required BLM to take the short-term action of removing excess wild horses under Section 3 of the Act (i.e., wild horses that exceeded the upper limit

10

of each AML), and the longer-term action of gathering wild horses in each HMA every three years in order to reduce the number to the lower limit of each AML.

Due to lack of funding, BLM removed few wild horses from the HMAs in 2009 and 2010. On October 4, 2010, RSGA requested that BLM remove all wild horses from its private lands pursuant to Section 4 of the Act.[2] Aplt. App. at 151; Aplee. Supp. App. at 188. BLM acknowledged RSGA's request, but explained that it lacked funds to gather wild horses in 2011 and that it would prioritize the requested gather in 2012. This prompted the RSGA to file suit against BLM in 2011. RSGA and BLM ultimately entered into a 2013 consent decree resolving the suit.

Under the 2013 consent decree, BLM agreed to remove all wild horses located on private lands in the Checkerboard (with an exception not applicable here). Aplt. App. at 121 ("Pursuant to 16 U.S.C. § 1334, BLM agrees to remove all wild horses located on RSGA's private lands, including Wyoming Checkerboard lands."). BLM also agreed to adjust its annual work plans as needed to gather wild horses from the Adobe Town HMA if census information showed the population there would exceed the AML's upper limit. The consent

---

[2] RSGA contends that this action amounted to a revocation of its consent to any wild horses anywhere in the Checkerboard. The record, however, does not support that contention. To begin with, the record indicates only that RSGA asked for wild horses to be removed from its own private lands. Further, the record indicates that RSGA's request in 2010 had no impact on the HMAs or AMLs.

11

decree also allowed up to 200 wild horses to remain on Checkerboard lands in the Adobe Town and Salt Wells HMAs, and up to 100 wild horses to remain in the Great Divide Basin HMA, before BLM was required to remove them. In addition, the consent decree stated that "BLM w[ould] commit to gather and remove wild horses from Checkerboard lands within Salt Wells and Adobe Town HMAs in 2013, [and] [Great] Divide Basin HMA in 2014 . . . with the exception of those wild horses that are allowed to remain as" outlined elsewhere in the consent decree. Id. at 123. Lastly, the 2013 consent decree stated that BLM would consider various proposed actions including changing the Salt Wells and Great Divide Basin HMAs to "Herd Areas," which would be managed for zero wild horses, and lowering the Adobe Town AML. Id. at 124.

*The 2013 and 2014 BLM gathers*

In 2013, BLM gathered wild horses in the Adobe Town and Salt Wells HMAs. This gather had a two-fold purpose: (1) to comply with the 2003 consent decree by removing wild horses that BLM determined were in excess of AMLs under Section 3 of the Act; and (2) to comply with the 2013 consent decree by removing wild horses from private lands within the Salt Wells Creek and Adobe Town HMAs pursuant to Section 4 of the Act. Notably, BLM stopped the gather once the lower limit of each AML was reached, leaving some wild horses on private lands within the Salt Wells and Adobe Town HMAs. In total, BLM gathered 668 wild horses. BLM subsequently returned 82 of those horses to the

12

non-Checkerboard solid-block public portions of the HMAs in an attempt to satisfy the AMLs' lower limits.

RSGA, the State of Wyoming, and local governments objected to BLM leaving any wild horses in the Checkerboard and to BLM relocating 82 of the gathered horses. After reevaluating the 2013 gather, BLM concluded that the 2013 consent decree obligated it to remove all wild horses from RSGA's private lands, including Checkerboard lands.

This conclusion in turn impacted BLM's plans for its 2014 gather. Specifically, BLM decided that in 2014 it would remove all wild horses from all of the Checkerboard portions of the Great Divide Basin, Adobe Town and Salt Wells HMAs, including both private and public parcels. Based upon 2014 census data, BLM estimated that these plans would result in the removal of approximately 800 wild horses located on Checkerboard lands in the Great Divide Basin, Adobe Town, and Salt Wells HMAs. BLM acknowledged that "in discharging its duties under Section 4 of the [Act] wild horses w[ould] also be removed from the public land portions of the [C]heckerboard," Aplt. App. at 179, and that these removals would result in the HMA populations dropping below those areas' AMLs, id. at 174. BLM asserted, however, that "due to the unique pattern of land ownership" within the Checkerboard, "and as recognized in the Consent Decree, it is practically infeasible for the BLM to meet its obligations under Section 4 of the [Act] while removing wild horses solely from the private

13

lands sections of the [C]heckerboard." Id. at 179.

As part of its planning process for the 2014 gather, BLM considered the proposed gather's potential environmental impacts. BLM concluded that, from an environmental perspective, the proposed gather did not involve any extraordinary circumstances, and thus in turn concluded that the proposed gather was categorically excluded from further documentation under NEPA.

On July 18, 2014, BLM issued a decision to proceed with the 2014 gather and posted its decision online. No parties administratively appealed or petitioned to stay the decision.

BLM's contractor proceeded to remove 1,263 wild horses from the Checkerboard lands within the Great Divide Basin (527 horses removed), Adobe Town (47 horses removed), and Salt Wells (689 horses removed) HMAs. BLM left approximately 649 wild horses on the adjacent solid-block public lands within the three HMAs (91 horses in the Great Divide Basin HMA, 519 horses in the Adobe Town HMA, and 39 horses in the Salt Wells Creek HMA). All of these numbers were below the respective HMAs' AMLs. In other words, the wild horse population in each HMA dropped below that HMA's AML.

II

Petitioners filed this action on August 1, 2014 seeking judicial review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. Petitioners alleged that BLM's permanent removal of 1,263 wild horses during the 2014

14

gather violated the Act, FLPMA, and NEPA, as well as BLM's governing RMPs.

On March 3, 2015, the district court issued a written order affirming BLM's actions as proper under the Act and the FLPMA, but remanding to BLM to correct deficiencies in its compliance with NEPA. With respect to BLM's actions under the Act and FLPMA, the district court held as follows:

> In summary, BLM did not abuse its discretion in interpreting Section 4 to permit a roundup removing horses from the [C]heckerboard as horses that stray from public land to private land, without engaging its Section 3 considerations. Allowing Section 3 considerations to affect roundups on the [C]heckerboard would result in the roundup essentially being governed by Section 3 herd management considerations and AMLs, rather than the landowner request to remove all horses. In short, under Petitioners' scenario, BLM's "removal" of horses becomes a simple move of horses, from the [C]heckerboard to the federal block. Then the horses will roam back to the [C]heckerboard range. This becomes a never-ending cycle of moving horses which roam or stray back, contrary to the Section 3 directive that management activities "be at the minimal feasible level" and the Section 4 directive that animals be removed (and not simply moved) from private lands. Consequently, the relief requested by Petitioners would satisfy neither Section 3 nor Section 4 and is thus not an outcome the Court will impose on BLM.
>
> Further, neither FLPMA, nor the RMPs relieve BLM of its Section 4 obligation to remove horses that stray from public lands to private lands.

App. at 79–80.

The district court concluded, however, that BLM failed to satisfy its obligations under NEPA:

> As to NEPA, the Court concludes BLM's decision to rely on a categorical exclusion (CX) with no extraordinary circumstances was erroneous. The record shows BLM decided it had "no choice but to

15

remove all horses from the [C]heckerboard regardless of what the impacts analysis would show" (AR3342). Thus, the agency moved ahead with a CX that failed to fully consider all relevant factors concerning the unusual removal proposed including areas of discretion available to the agency which might mitigate impacts. This course of action fails to satisfy the agency's NEPA obligations.

Id. at 80. Consequently, the district court remanded "the NEPA compliance matter associated with the 2014 roundup . . . to BLM to correct the procedural deficiencies." Id.

On April 6, 2015, petitioners moved the district court to certify its order for immediate appeal pursuant to Fed. R. Civ. P. 54(b). The district court formally granted that motion on May 13, 2015, but concluded in its order granting the motion that its March 3, 2015 order "affirming BLM's actions in gathering horses on the . . . Checkerboard [wa]s a final order under 28 U.S.C. § 1291," and that "both the nature of BLM's proceeding and the character of the decision indicate[d] that the administrative-remand rule d[id] not apply." Dist. Ct. Docket No. 93 at 5. The district court entered final judgment that same day in favor of respondents on petitioners' claims under the Act and the FLPMA. On May 14, 2015, the district court entered an amended judgment in favor of respondents on all claims. Petitioners filed a notice of appeal on May 18, 2015.

### III

Before proceeding to the merits of petitioners' appeal, we must first satisfy ourselves that we have appellate jurisdiction over this matter. Shortly after

16

petitioners filed their notice of appeal, we issued an order directing the parties to file briefs "setting forth any basis in law or fact for [our] appellate jurisdiction." Order of 5/27/15 at 2. The parties have, as directed, filed briefs addressing this question. Respondents argue that we lack jurisdiction because the district court remanded the case to BLM. Respondents also argue that, in any event, the case is moot.

*Appellate jurisdiction and the administrative remand rule*

"Absent a specific statutory grant of jurisdiction over a particular type of dispute, we exercise jurisdiction over final decisions of the federal district courts pursuant to 28 U.S.C. § 1291." W. Energy All. v. Salazar, 709 F.3d 1040, 1047 (10th Cir. 2013). "A final decision is one 'that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" Id. (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 467 (1978)).

We have long held that "[t]he remand by a district court to an administrative agency for further proceedings is ordinarily not appealable because it is not a final decision." Bender v. Clark, 744 F.2d 1424, 1426–27 (10th Cir. 1984). "This general principle has been called the 'administrative-remand rule.'" W. Energy All., 709 F.3d at 1047 (quoting Trout Unlimited v. U.S. Dep't of Agric., 441 F.3d 1214, 1218 (10th Cir. 2006)).

In this case, petitioners asserted claims under the Act, FLPMA, and NEPA. The district court's March 3, 2015 order completely resolved petitioners' claims

17

under the Act and FLPMA, but determined that BLM failed to comply with NEPA and thus remanded to BLM to correct what it characterized as procedural deficiencies. In issuing final judgment in the case, however, the district court concluded that the administrative remand rule did not apply. More specifically, the district court concluded that "the nature of the agency action in this case [wa]s essentially legislative," "[t]he only effect of the remand was to require BLM [to] initiate proceedings to correct a procedural deficiency," and the remand did not prevent BLM from conducting future gathers on the Checkerboard. Dist. Ct. Docket No. 93 at 4–5.

Although respondents dispute the district court's analysis and argue that this case falls squarely within the scope of the administrative remand rule, we disagree. "[W]hen considering whether a remand has occurred in a given case, appellate courts must consider the nature of the agency action as well as the nature of the district court's order." New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 697 (10th Cir. 2009). "'The administrative action may be essentially adjudicatory, essentially legislative, or some nonadversarial action such as grant of a license.'" Id. (quoting 15B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure: Jurisdiction and Related Matters § 3914.32, at 237 (2d ed. 1992)). "Typically, a 'remand' from a district court to an agency occurs when an agency has acted in an adjudicative capacity." Id. In other words, "our precedent indicates that we view the remand

18

rule as most appropriate in adjudicative contexts." Id. at 698. We also take into account "the character of the dispositive district court order," including whether it "returns an action to a [the agency] for further proceedings." Id.

Examining those characteristics in this case, we conclude that the district court's order "does not share the features of a typical remand." See id. To begin with, nothing in the record indicates that BLM was acting in an adjudicative capacity when it decided to proceed with the 2014 gather. Rather, BLM interpreted the Act to determine its obligations thereunder, and then took concrete action consistent with its interpretation. In turn, BLM has appeared in this action "as a traditional adversarial party, defending its own actions against challenges by [petitioners], rather than defending a ruling made by [it] in a controversy between parties appearing before it." See id. As for the district court's order, it is true that it remanded to BLM so that BLM could correct procedural deficiencies in its NEPA analysis.[3] But the 2014 gather had already taken place at the time the district court issued its order. Consequently, the district court's order had no impact whatsoever on the gather at issue in this case. Further, as the district court itself noted in entering final judgment, the remand had no impact on BLM's ability to invoke the same analysis of the Act and proceed with future gathers on the Checkerboard. Thus, it would be ironic if the administrative remand rule

---

[3] The record indicates that BLM has now prepared an environmental assessment of its 2014 gather.

19

operated to prevent petitioners' claims under the Act and FLPMA from being considered final.

For these reasons, we conclude that the administrative remand order does not apply in this case and that it is proper for us to treat the district court's order as final for purposes of § 1291.

*Mootness*

Respondents argue, however, that the completion of the 2014 gather renders this case moot and thus deprives us of appellate jurisdiction. Petitioners argue in response "that this case is not only *capable* of repetition but is, in fact, presently being repeated." Petitioners' Rule 28(j) Letter of 9/26/16 at 1 (emphasis in original). In support, petitioners assert that on September 16, 2016, BLM issued a decision again interpreting Section 4 of the Act as "authoriz[ing] BLM to permanently remove *all* federally protected wild horses from the *public* and private Checkerboard lands of the Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs." Id. (emphasis in original).

Supreme Court precedent "recognize[s] an exception to the mootness doctrine for a controversy that is capable of repetition, yet evading review." Kingdomware Techs., Inc. v. United States, — U.S. —, 136 S. Ct. 1969, 1976 (2016) (quotation marks omitted). "That exception applies only in exceptional situations, where (1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable

20

expectation that the same complaining party [will] be subject to the same action again." Id. (quotation marks omitted) (alterations in original).

We conclude that the exception applies in this case. Focusing first on the duration of the challenged action, BLM issued its decision to proceed with the 2014 gather on July 18, 2014. Petitioners promptly filed this action on August 1, 2014, challenging BLM's decision. When the district court issued its decision approximately seven months later, on March 3, 2015, the gather had already taken place. In other contexts, the Supreme Court has "held that a period of two years is too short to complete judicial review." Kingdomware Techs., 136 S. Ct. at 1976. As a result, we have little trouble concluding that a period of less than seven months is likewise "too short to complete judicial review" and thus weighs in favor of the exception.

In turn, the record establishes a reasonable expectation that BLM will engage in similar future gathers. Indeed, the supplemental information supplied by petitioners in their Rule 28(j) letter indicates that BLM is set to conduct a gather in October 2016 that will be substantially similar in character to the 2014 gather at issue in this appeal.[4] By its own admission, BLM plans to remove wild horses from both private and public land parcels of the Checkerboard pursuant to Section 4 of the Act, and such removal will likely reduce the wild horse

_____

[4] Notably, BLM prepared and released for public comment an environmental assessment for this planned 2016 gather.

21

populations in the three HMAs at issue below the AMLs for those HMAs.

BLM's only response is that "any decision of this Court concerning the *2014* gather will not necessarily affect the *2016* gather" because "BLM has more comprehensively evaluated and addressed petitioners' proposals concerning Sections 3 and 4 of the . . . Act in BLM's new environmental assessment . . . and new decision record," and "[t]his Court should wait to see BLM's in-depth rationale for rejecting petitioners' proposed interpretations of the . . . Act." Respondents' Rule 28(j) letter of 9/27/16 at 1–2 (emphasis in original) (citations omitted). Quite clearly, however, the Act has not been amended since the 2014 gather, nor has the character of the Checkerboard changed. And, not surprisingly, the supplemental information provided by petitioners regarding the planned 2016 gather indicates that BLM continues to interpret the Act in substantially, if not identically, the same manner that it did in choosing to proceed with the 2014 gather.

In summary, we conclude that, were we not to invoke the capable-of-repetition-yet-evading-review exception, petitioners would never be able to mount a timely challenge to BLM's interpretation of the Act. Consequently, we conclude that this case is not moot.

IV

Petitioners appeal from the district court's decision concluding that BLM did not violate the Act or the FLPMA in carrying out the 2014 gather. "We

22

review the district court's decision de novo." Jagers v. Federal Crop Ins. Corp., 758 F.3d 1179, 1184 (10th Cir. 2014). But, in doing so, we "review the underlying agency decision under the deferential [APA] standard of review." Id. Under the APA, "we may only set aside the [agency's] actions if . . . it acted arbitrarily or capriciously, not in accordance with the law, beyond its jurisdictional authority, or 'without observance of procedure required by law.'" WildEarth Guardians v. U.S. Fish and Wildlife Serv., 784 F.3d 677, 682 (10th Cir. 2015) (quoting 5 U.S.C. § 706(2)(D)).

*BLM's interpretation of Sections 3 and 4 of the Act*

In their first issue on appeal, petitioners challenge "the district court's affirmance of BLM's . . . construction of the . . . Act" authorizing it "to permanently remove wild horses from *public* land under Section 4 of the [Act]." Aplt. Br. at 34 (italics in original). According to petitioners, "it is indisputable that Section 3 of the . . . Act . . . governs all BLM actions related to wild horses on public land, while Section 4 of the Act . . . governs BLM's actions on private land." Id. at 37 (citations omitted). Petitioners in turn argue that "under the statute's plain terms, BLM has a non-discretionary statutory obligation to comply with Section 3 before taking action to permanently remove any horses from the Wyoming Checkerboard's public lands." Id. at 37–38. The problem, petitioners argue, is that "BLM entirely ignored its Section 3 duties and," in reliance on Section 4 of the Act, "treated the entire Checkerboard, including the *public* lands

23

found therein, as if it all belonged to RSGA." Id. at 38. "In so doing," petitioners argue, BLM "violated the plain language of the Act by: (1) permanently removing wild horses from public land without first satisfying any of the statutory prerequisites that apply to the removal of wild horses from public land, (2) removing non-excess wild horses from the public lands, and (3) reducing and managing wild horse populations in these HMAs significantly below their legally established AMLs." Id.

These arguments essentially call into question whether BLM, in carrying out the 2014 gather, acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). To resolve this question, we apply the two-part standard of review outlined by the Supreme Court in Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, 467 U.S. 837, 842–43 (1984). See WildEarth, 784 F.3d at 683 (holding that appellate review under APA section 706(2)(C) proceeds under the Chevron framework). Under the first step of the Chevron framework, we must determine "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842–843. "If, however, [we] determine[] Congress has not directly addressed the precise question at issue," we proceed to the second step of the analysis. Id. at 843. Rather than "simply impos[ing] [our] own construction on the statute, as would be

24

necessary in the absence of an administrative interpretation," we must determine "whether the agency's answer is based on a permissible construction of the statute." Id. This deferential standard of review applies because "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Id. (alteration in original) (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)). In short, the Supreme Court "ha[s] long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." Id. at 844.

Our inquiry thus begins with the question of whether, in Sections 3 and 4 of the Act, Congress directly addressed what BLM should do with respect to wild horses that roam freely between unfenced sections of public and private land. Petitioners contend that "[t]he plain language of the . . . Act could not be any clearer: Section 3 governs *all* BLM actions on *public* lands related to wild horses and delineates the specific legal prerequisites that must be satisfied before BLM may permanently remove *any* wild horses from public land allocated to a wild horse HMA." Aplt. Br. at 39 (emphasis in original). Thus, petitioners contend, BLM is statutorily authorized under Section 3 to remove wild horses from public lands only after it determines "that an overpopulation exists on a given area of the

25

public lands and that action is necessary to remove excess animals" in order "to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2).

BLM argues, in response, that the "Act itself is silent on how BLM is to address th[e] unique land management problem" presented by the Checkerboard. Aplee. Br. at 26. More specifically, BLM argues that "the plain language of Sections 3 and 4 simply do not speak to what the agency should do when public and private lands are so intertwined that it is impossible to manage them for wild horses separately." Id. BLM in turn argues that "[i]n approving the 2014 gather, [it] reasonably exercised its discretion to harmonize its multiple statutory obligations." Id. BLM argues that it reasonably addressed the unique land management situation presented here by treating all parcels of land within the Checkerboard, both private and public, "as 'private lands' for the purposes of horse removal" under Section 4. Id. at 22. Thus, BLM argues, "[t]his Court should defer to BLM's reasonable interpretation of the . . . Act." Id. at 26.

We conclude that petitioners have the better of the argument. As they correctly note, there is simply no ambiguity in the terms "public lands," "privately owned land," and "private lands" that are utilized in Sections 3 and 4 of the Act, and in turn no basis for BLM to construe the terms "privately owned land" and "private lands" to include the public land sections of the Checkerboard. Indeed, there is no indication in the record that BLM's decision in this case was motivated by what it considered to be an ambiguity in the text of the Act

26

regarding the meaning of the terms "privately owned land" and "private lands" (or

for that matter, "public lands").  BLM has never asserted, let alone concluded as

part of its decision-making process, that the Act is ambiguous in this regard.[5]  Nor

has BLM ever asserted, let alone concluded, that the Act is ambiguous with

respect to the duties it imposes on BLM with respect to these two categories of

land.

Rather, BLM ultimately concluded, in preparing for the 2014 gather, that

"due to the unique pattern of land ownership" within the Checkerboard, "it [wa]s

practicably infeasible for [it] to meet its obligations under Section 4 of the [Act]

while removing wild horses solely from the private lands sections of the

[C]heckerboard."  Aplt. App. at 179.  In other words, by BLM's own admission, it

is the unique geographic and ownership features of the Checkerboard itself that

give rise to the problem here.[6]  By the time that BLM can mount its resources to

perform a Section 4 gather in response to a private landowner's complaint, the

---

[5] BLM simply stated in its 2014 decision documents that it "w[ould] gather all wild horses from the [C]heckerboard within the HMA as required by Section 4 of the [Act] and the Consent Decree."  Aplt. App. at 176.  At no point has BLM ever identified what portion of the Act it believes is ambiguous or that otherwise provides it with discretion to treat the public land sections of the Checkerboard as private lands under Section 4.

[6] Sections 3 and 4 appear to rest on two related assumptions that are not, in fact, true in this case: that the areas of public land managed by BLM, as well as the areas of private land adjacent to such public land, will be large enough and distinct enough that there will be little or no tension between the management responsibilities outlined in the two sections.

27

offending wild horses are likely to have moved on to different public or private parcels of land. Further, the relatively small size of the public and private parcels within the Checkerboard, their proximity to each other, and the lack of fencing mean that there will be a constant influx and outflux of wild horses in a particular parcel, whether public or private. And, in turn, it renders BLM's Section 4 gathering activities ineffective to some degree. Indeed, BLM and RSGA agreed in their 2013 consent decree that "since 1971, when Congress enacted the Act, wild horse numbers within the . . . Checkerboard and elsewhere have proven difficult to control." Aplt. App. at 119. This statement continues to be true, if not in fact a gross understatement.

But these very practical realities do not provide BLM with the authority to construe the Act in a manner contrary to its plain and unambiguous terms. Although BLM argues that it possesses "discretion to determine how to respond to" a Section 4 removal request made by a private landowner, Aplee. Br. at 34, nothing in Section 4 or elsewhere in the Act allows BLM to ignore the duties and responsibilities imposed upon it by Section 3, or to respond to a Section 4 removal request by treating public lands as private lands. To be sure, BLM can, as part of a Section 4 gather, also remove wild horses from adjacent public land parcels. But in doing so, it must abide by the plain terms of Section 3.

To the extent that BLM contends its actions are authorized by the various consent decrees that it has entered into, it never explains how such consent

28

decrees can override the clear and unambiguous language of Sections 3 and 4 of the Act.

Lastly, we conclude that the Ninth Circuit's decision in <u>Fallini v. Hodel</u>, 783 F.2d 1343 (9th Cir. 1986), although not directly on point, supports the petitioner's position in this case. In <u>Fallini</u>, the Ninth Circuit held that Section 4 of the Act requires BLM, "[u]pon notification" by a private landowner, "to remove" wild horses that have "stray[ed] onto his or her land," but "does not require . . . BLM to prevent straying [of wild horses from public lands to private lands] in the first instance."[7]  <u>Id.</u> at 1345.  <u>Fallini</u> is relevant here because BLM in the instant case was effectively attempting to stop wild horses from straying from the public land sections of the Checkerboard to the private land sections of the Checkerboard by treating the public land sections of the Checkerboard as private lands under Section 4.

For these reasons, we conclude that BLM's decision cannot survive step one of the <u>Chevron</u> analysis.  It is simply improper for BLM to construe the unambiguous terms "privately owned land" and "private lands," as used in Section 4 of the Act, to include the public land sections of the Checkerboard.[8]

_____

[7] To be sure, <u>Fallini</u> did not involve a land pattern like the one at issue here; instead, it involved "approximately 1,800 acres of private land" that was part of an allotment that "contain[ed] an additional 657,520 acres of public land." 783 F.2d at 1344.

[8] It is apparent that BLM needs to find a workable solution to the problems
(continued...)

29

And, in turn, it was improper for BLM to conduct what it described as a Section 4 gather on the public land sections of the Checkerboard. By doing so, BLM violated the duties that Section 3 clearly imposes on it with respect to wild horses found on the public land sections of the Checkerboard.

*Did the 2014 gather violate the FLPMA?*

In their second issue on appeal, petitioners argue that BLM's 2014 gather violated the FLPMA because it resulted in the wild horse populations in each of the three HMAs dropping below their respective AMLs. According to petitioners, BLM "*de facto* modif[ied] its AMLs in these HMAs outside of the FLPMA . . . processes that are legally required for such modifications." Dist. Ct. Docket No.

---

[8](...continued)
imposed by the Checkerboard. Although petitioners argue that "Congress was acutely aware of the peculiarities of the Checkerboard when it enacted the Wild Horse Act in 1971" because "Congress itself established the Checkerboard ownership pattern in 1862," that argument is unconvincing. Aplt. Br. at 40. To begin with, the legislation that resulted in the Checkerboard was enacted over 100 years prior to the enactment of the Act at issue here. Further, petitioners point to nothing in the legislative history of the Act indicating that Congress took into account the unique land pattern of the Checkerboard in imposing the Section 3 and 4 requirements of the Act.

Perhaps the solution can come in the form of amendments to the areas designated as HMAs, and/or to the AMLs applicable to the HMAs at issue. As noted in the background section, the 2013 consent decree stated that BLM would consider changing the Salt Wells and Great Divide Basin HMAs to "Herd Areas," which would be managed for zero wild horses, and lowering the Adobe Town AML. Aplt. App. at 124.

Short of these potential adjustments, which may have little effect, the ultimate solution must come from Congress. Congress is in the best position to specifically address the seemingly unworkable requirements Section 3 and 4 place upon BLM in its management of this unique area.

30

1 at 37.  Petitioners in turn argue that the FLPMA prohibits BLM "from modifying AMLs until [it] has evaluated specific evidence and data as part of an extensive notice-and-comment RMP amendment process."  Aplt. Br. at 61.  In other words, petitioners argue, "BLM was required to go through the formal RMP amendment process under FLPMA in order to reduce the AMLs."  Id. at 62.  By failing to do so, petitioners argue, "BLM has acted arbitrarily and capriciously, and not in accordance with FLPMA, [its own] regulations, or the operative RMPs."  Id. at 63.

We agree with petitioners.  BLM's sole response to the FLPMA claim is that it was not required to consider the AML levels because such a determination is not relevant to a Section 4 gather, such as the one it purportedly conducted on the Checkerboard in 2014.  But we have already concluded that the 2014 gather, to the extent it involved removal of wild horses from the public land sections of the Checkerboard, was not a proper Section 4 gather.  That conclusion effectively eliminates BLM's defense to the FLPMA claim.  We therefore conclude that BLM violated the FLPMA by conducting the 2014 gather on public lands.

V

For the reasons outlined above, we agree with petitioners that BLM violated both the Act and the FLPMA.  Consequently, the judgment of the district court is REVERSED.

31

# Wild Horse Management Areas
## Rock Springs Field Office



02130

32

15-8033, <u>American Wild Horse Preservation v. Jewell</u>

**McKAY**, Circuit Judge, concurring:

I join the court's Opinion but add some observations of my own.

It falls to the BLM to protect wild horses under the Wild Horses Act. It has broad discretion in applying its expertise in carrying out that mission. The text of the statute, in some regards, could not be more clear: To remove wild horses from *public* land, the BLM must first determine "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals." Then, and only then, can the BLM "remove excess animals from the range so as to achieve appropriate management levels." In most parts of the country, the BLM can readily comply with these dual statutory mandates. As applied to the checkerboard region of Wyoming, however, the statutory scheme falls apart. The BLM tried in good faith to use its broad discretion and expertise to carry out this mandate. Its methodology was to treat public lands as private lands. But, though the BLM's solution to the problem presented by the checkerboard may seem reasonable, it is not in accordance with the statute.

The problem that keeps bringing this matter to the court arises from the one section of the act which is clear, unmistakable, mandatory, and non-discretionary: Section 4. Under this section, private landowners have the absolute right to exclude wild horses and burros from their land. If they do not consent, then by definition, their lands with their corresponding forage may not be included in the decision about herd size or at the primary decision level which is the designation of herd management areas (HMAs). It seems to me that the only way the BLM can ultimately lawfully achieve its Section 3

duty to maintain wild herds and prevent destruction of viability caused by over grazing on public lands is to go back to step one and make appropriate judgments by redetermining the HMAs without the non-permissive use of private lands.