**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 27 1998**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ASSOCIATIONS WORKING FOR
AURORA'S RESIDENTIAL
ENVIRONMENT, a non-profit
corporation,

      Plaintiff - Appellant,

v.

COLORADO DEPARTMENT OF
TRANSPORTATION; LAURENCE
WARNER, Transportation Director,
Region 6, Colorado Department of
Transportation; FEDERAL
HIGHWAY ADMINISTRATION;
JAMES DAVES, Acting Division
Administrator of the Federal Highway
Administration,

      Defendants - Appellees.

No. 97-1418

---

CITY OF AURORA,

      Amicus Curiae.

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 97-N-1161)**

---

Robert S. Ukeiley, Boulder, Colorado, for the Plaintiff - Appellant.

Jeffrey C. Dobbins, Department of Justice, Washington, D.C. (Robert L. Klarquist, Department of Justice, Washington, D.C.; Lois J. Schiffer, Assistant Attorney General; Henry L. Solano, United States Attorney; and Robert D. Clark, Assistant United States Attorney, Denver, Colorado, with him on the brief) for the Defendants - Appellees Federal Highway Administration and James Daves.

Gregory A. Jamieson, Assistant Attorney General, and Harry S. Morrow, First Assistant Attorney General (Gale A. Norton, Attorney General, with them on the brief), Denver, Colorado, for the Defendants - Appellees Colorado Department of Transportation and Laurence Warner.

Charles H. Richardson and Teresa Kinney, Office of the City Attorney, Aurora, Colorado, filed an amicus curiae brief for the City of Aurora.

---

Before **HENRY** , **HOLLOWAY** and **LUCERO** , Circuit Judges.

---

**LUCERO** , Circuit Judge.

---

Associations Working For Aurora's Residential Environment ("AWARE"), a non-profit corporation comprised of individuals and businesses who reside in or around the Parker Road/I-225 interchange in Aurora, Colorado, appeals an order refusing to enjoin defendants from beginning construction at that interchange. Plaintiff asserts three claims on appeal: (1) defendants failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370d, and its implementing regulations by allowing a private contractor with a conflict of interest to assist in the preparation of the Environmental Impact Statement ("EIS") for the proposed project; (2) defendants failed to consider structural mass transit as a reasonable alternative to construction in violation of 42 U.S.C. §

4332(C)(iii) and 40 C.F.R. § 1502.14(c); and (3) defendants failed to consider "feasible and prudent" alternatives to developing publicly owned land in violation of the Transportation Act, 49 U.S.C. § 303(c)(1). We conclude that, to the extent that the contractor operated under a conflict of interest, the Colorado Department of Transportation ("CDOT") exercised sufficient supervision to preserve the "objectivity and integrity of the NEPA process." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations ("Forty Questions"), 46 Fed. Reg. 18,026, 18,031 (Council on Envtl. Quality 1981). We also conclude that defendants adequately considered alternatives to construction and to the use of publicly owned lands. Accordingly, we affirm.

**I**

The history of the construction project at issue begins in 1985, when CDOT entered into a contract with CH2M Hill (the "Contractor"), a private contractor, to identify "the short and long-term needs" for a one-mile segment of Parker Road where it meets with I-225, a major intersection in the Denver metropolitan area. Appellees' Supp. App., Ex. A, at 50,003. The contract provided that, after those needs had been identified, the Contractor was to provide "preliminary and final design plans for the selected short-term improvement concept." Id. In August 1987, the Contractor completed a feasibility study, which concluded that there

were "severe congestion problems" in the target area and proposed both long- and short-term solutions to those problems. Appellant's App. at 37.

In April 1989, CDOT and the Contractor entered into a supplemental contract that authorized the Contractor to assist CDOT in refining the proposed solution and preparing an environmental assessment for the project, and to complete the preliminary engineering for the recommended improvements. In October 1991, CDOT and the Contractor entered into another supplemental contract authorizing the Contractor to perform preliminary and final design work for the Parker Road project.    See Appellees' Supp. App., Ex. A, at 50,129, 50,159-61. At the time of the execution of the 1991 contract, the parties anticipated that construction would begin in late 1993 or early 1994.

In 1992, the proposed project became the subject of controversy. As a result, the I-225/Parker Road Interchange Citizens' Advisory Committee ("CAC") was established "to develop a new or modified version of corridor/interchange improvements." Appellees' Supp. App. at A294. The membership of the CAC comprised 23 individuals, including one member of AWARE. Although not members of the CAC, representatives from CDOT and the Contractor were part of a "Project Planning Team responsible for guiding and assisting the CAC."    Id. The CAC evaluated fourteen alternatives for the Parker Road corridor and

-4-

ultimately proposed a majority and minority solution, both of which involved construction of highway improvements in the target area.

As a result of the CAC proposal, CDOT decided to develop an environmental impact statement for the proposed project. [1] In January 1993, CDOT conducted a scoping meeting to discuss the preliminary design alternatives to be included in the EIS. Representatives from CDOT, the Contractor, the United States Army Corps of Engineers, the Colorado Division of Parks and Outdoor Recreation, the City of Aurora, the Regional Transportation District ("RTD"), and the Federal Highway Administration ("FHWA") attended that meeting.

On January 31, 1994, CDOT and the Contractor entered into another supplemental contract authorizing the Contractor to assist in the development of the EIS. A key dispute in this litigation is whether that supplemental contract simply added to the scope of the existing duties of the Contractor, which included final design work for the construction of improvements at Parker Road, or whether the 1994 agreement amended the scope of work to eliminate final design work pending the outcome of the EIS.

---

[1]A comprehensive, site-specific environmental impact statement is required for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

In March 1996, defendants issued a draft environmental impact statement and notice was published in the Federal Register. See 61 Fed. Reg. 10,754, 10,754 (1996). After a public hearing to receive comment on the draft EIS, the FHWA and CDOT issued the final environmental impact statement. Another hearing was held to receive public comment and explain the preferred alternative. In December 1996, defendants issued the Record of Decision ("ROD"), which approved the preferred construction alternative in the final EIS.

In January 1997, CDOT and the Contractor executed a supplemental contract authorizing the Contractor to assist in the preliminary and final design of the preferred alternative. Shortly after CDOT began soliciting bids from construction contractors, AWARE brought the present action seeking a preliminary injunction. That motion was consolidated with a trial on the merits before the district court. The district court concluded that plaintiff was not entitled to an injunction and entered final judgment on the merits in favor of defendants. It is from that order that plaintiff now appeals. [2]

---

[2]Although the parties have each submitted numerous materials in separate appendices, this court has not been provided with the entire administrative record. We therefore defer to findings of fact by the district court where the record on appeal is insufficient for us to determine whether those findings are clearly erroneous. See United States v. Vasquez, 985 F.2d 491, 494-95 (10th Cir. 1993); cf. McEwan v. City of Norman, 926 F.2d 1539, 1550 (10th Cir. 1991) ("Generally, a party may not assign error on appeal unless he . . . designates that part of the district court proceeding relevant thereto for appellate review.").

## II

In the National Environmental Policy Act, Congress recognizes that each generation is a "trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b)(1). Accordingly, NEPA mandates that federal agencies comply with certain procedures before taking actions that will affect the quality of the environment to ensure that appropriate consideration is given to the environmental impacts of those actions. See, e.g. , 42 U.S.C. § 4332(2)(C) (listing the requirements for an environmental impact statement). "It is 'well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.'" Holy Cross Wilderness Fund v. Madigan , 960 F.2d 1515, 1522 (10th Cir. 1992) (quoting Robertson v. Methow Valley Citizens Council , 490 U.S. 332, 350 (1989)). Thus, in reviewing agency decisions, it is not for the court to select what it believes to be the optimum alternative, see Stryker's Bay Neighborhood Council, Inc. v. Karlen , 444 U.S. 223, 227-28 (1980) (per curiam); rather, our review is limited to whether the agency complied with the "'action-forcing' procedures" required by NEPA to guarantee that agencies take a "hard look" at the environmental consequences of proposed actions. Robertson , 490 U.S. at 350 (quoting Kleppe v. Sierra Club , 427 U.S. 390, 410 n.21 (1976)).

### A. Conflict of Interest

-7-

When a federal agency proposes to undertake a "major action[] significantly affecting the quality of the human environment," NEPA requires that it prepare an environmental impact statement. 42 U.S.C. § 4332(2)(C). Under implementing regulations promulgated by the Council on Environmental Quality ("CEQ"), an agency may either prepare the EIS itself or it may select a contractor to do so. See 40 C.F.R. § 1506.5(c). If the agency chooses to have a contractor prepare the EIS, that contractor must "execute a disclosure statement . . . specifying that [it has] no financial or other interest in the outcome of the project." Id. A contractor with a known conflict "should be disqualified from preparing the EIS." Forty Questions, 46 Fed. Reg. at 18,031.

Plaintiff contends that we must invalidate the EIS for the Parker Road project because the Contractor had an incentive to promote a build alternative over a non-build alternative at the time it aided in the preparation of the EIS. Specifically, it argues that the Contractor either had an enforceable contract for future work on the project, or that CDOT's unvarying practice of awarding final design contracts to the company that prepares the EIS amounts to a conflict of interest here because the Contractor won the contract in a non-competitive bid process. [3] According to plaintiff, this alleged conflict is aggravated by the

_____

[3]CDOT argues that plaintiff is precluded from raising this issue on appeal because it did not assert this argument before the district court. See Jenkins v.
(continued...)

-8-

Contractor's failure to execute the required conflict of interest disclosure statement, see 40 C.F.R. § 1506.5(c), until after the final EIS had been issued.

Whether the Contractor had a conflict of interest or not rests on the definition of "financial or other interest" under § 1506.5(c). That phrase, however, has eluded precise definition. In 1981, the CEQ interpreted the conflict provision "broadly to cover any known benefits other than general enhancement of professional reputation." Forty Questions, 46 Fed. Reg. at 18,031. [4] Even then, however, the CEQ conceded that a contractor may "later bid in competition with others for future work on the project" if that contractor "has no promise of future work or other interest in the outcome of the proposal." Id. After discovering that many agencies had "been interpreting the conflicts provision in an overly burdensome manner," the CEQ instructed that, absent an agreement to perform construction on the proposed project or actual ownership of the construction site,

---

[3](...continued)
Wood, 81 F.3d 988, 996 (10th Cir. 1996). We disagree. Plaintiff has consistently argued that CDOT's practice of awarding final design contracts to the contractor that prepares the EIS amounts to a conflict of interest for that contractor. Plaintiff's suggestion on appeal that we adopt such an interpretation of § 1506.5(c) is an extension of its arguments before the district court.

[4]Although we recognize that we may rely on the interpretive guidance offered by the CEQ, the Forty Questions document is not owed the substantial deference afforded to administrative rules that are the product of notice and comment procedures. See Northern Crawfish Frog (Rana Areolata Circulosa) v. Federal Highway Admin., 858 F. Supp. 1503, 1527 n.12 (D. Kan. 1994) (gathering cases).

it is "doubtful that an inherent conflict of interest will exist" unless "the contract for EIS preparation . . . contain[s] . . . incentive clauses or guarantees of any future work on the project." Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34,263, 34,266 (Council on Envtl. Quality 1983).

The FHWA has also struggled to define what constitutes a conflict of interest. In a 1988 memorandum, the FHWA construed "financial or other interest in the outcome of the project" to exclude a contract for further project development work. Appellees' Supp. App. at A316. In 1995, the FHWA abandoned that interpretation and concluded that a contract for future work would constitute a conflict under the regulations. See id. at A317. In 1996, however, the FHWA re-adopted the 1988 guidance after receiving numerous "inquiries and comments reflecting concerns about [the 1995] guidance." Id. at A320.

Despite these inconsistent interpretations, we agree with the district court that a contractor with "an agreement, enforceable promise or guarantee of future work" has a conflict of interest under § 1506.5(c). Appellant's App. at 65. In this case, however, the contract between CDOT and the Contractor did not create such an arrangement. Notwithstanding plaintiff's argument to the contrary, the 1994 supplemental contract between CDOT and the Contractor did supplant the scope of work provision under the 1991 contract, thereby eliminating any contractual guarantee the Contractor had to perform final design work. Each of

the contracts in the record contain a scope of work section that describes the Contractor's obligations with respect to the design work for the project. In the 1991, 1994, and 1997 contracts, that scope of work section took the form of a checklist listing all of the required tasks involved in preliminary and final design. Next to each task on these checklists, there is an X indicating that it is the Contractor's obligation, an X indicating that CDOT has retained that obligation, an X in each column indicating a shared duty, or no mark at all. Absence of a mark indicates that the task responsibility is not assigned by that contract. As the parties entered supplemental contracts, each new scope of work section redefined the parties' obligations under the agreement. See Appellant's App. at 107 ("[T]he assignments associated with the work activities have changed to achieve Aurora's Citizen Advisory Committee objectives."). Although the Contractor was clearly obligated to complete both preliminary and final design work under the 1991 contract, none of the tasks related to final design are marked on the checklist in the 1994 contract. Thus, in 1994 the Contractor's duties did not include final design. We therefore agree with the district court that, at the time its services were employed to develop the EIS, the Contractor had no contractual guarantee of future work on the project. [5]

_____

[5]Plaintiff argues that it was improper for the district court to rely on the testimony of representatives of CDOT and the Contractor about their

(continued...)

-11-

Plaintiff also argues that, even absent an enforceable promise, the Contractor operated under a conflict of interest because CDOT consistently awards final design contracts to the firm that prepares the EIS and the Contractor here received the final design contract through a non-competitive bid process. [6] The district court rejected plaintiff's argument on two alternate grounds: (1) it interpreted § 1506.5(c) to exclude a mere expectation of future work from the definition of "financial or other interest," see Appellant's App. at 65; and (2) it concluded that, to the extent that CDOT's practice could give rise to a conflict, defendants oversaw the Contractor's work to a sufficient degree that such conflict would not require invalidation of the EIS in this case, see id. at 70-72. Accepting

[5](...continued)
understanding of the contract's meaning because such testimony is not part of the administrative record and, alternatively, because Colorado applies the parol evidence rule to contracts. We need not reach these issues because our review of the "contract documents," see Appellant's Br. at 19, reveals that the 1994 scope of work provision clearly superseded any obligations the Contractor had under previous agreements. See Appellant's App. at 107 ("The original supplemental work activities assignment tasks are attached for more clarification. . . . Enclosed is a fully executed copy of our revised scope of work with CH2M Hill for this project.") (emphasis added). Moreover, the materials in the administrative record reinforce that interpretation. See id. at 198 (Contractor Disclosure Statement) ("No final design tasks were included in the revised scope and there was no promise on the part of CDOT for future design work."). Thus, any error in admitting such testimony would be harmless because it merely reiterates what the documents state clearly on their face.

[6]Plaintiff goes so far as to argue that "CH2M Hill must have known that if the build alternative was chosen as a result of the EIS they were preparing, they would get to perform the final design work or could sue under a theory of detrimental reliance or promissory estoppel." Appellant's Br. at 20.

for the sake of argument that the Contractor's heightened expectation that it would receive the contract for future design work amounted to a conflict, we nevertheless agree with the district court's conclusion that the degree of oversight exercised by defendants, particularly CDOT, is sufficient to cure any defect arising from that expectation.

The procedural requirements of NEPA and its implementing regulations are designed to force agencies proposing to take any action that will affect the natural environment to take a "hard look" at the environmental consequences. See Robertson, 490 U.S. at 350. When reviewing an EIS prepared by a contractor who has allegedly breached a requirement imposed by 40 C.F.R. § 1506.5(c), the ultimate question for the court is thus whether the alleged breach compromised the "'objectivity and integrity of the NEPA process.'" Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 202 (D.C. Cir. 1991) (quoting Forty Questions, 46 Fed. Reg. at 18,031); see Holy Cross, 960 F.2d at 1529 (concluding that, although procedure followed deviated from "typical order of events" in a NEPA case, circumstances led to conclusion that agency had taken the requisite "hard look" at environmental factors); Northern Crawfish Frog (Rana Areolata Circulosa) v. Federal Highway Admin., 858 F. Supp. 1503, 1529 (D. Kan. 1994); Sierra Club v. Marsh, 714 F. Supp. 539, 583 (D. Me. 1989); see also Brandon v. Pierce, 725 F.2d 555, 563-64 (10th Cir. 1984) (holding prior to passage of CEQ

regulations that contractor's apparent conflict did not mandate invalidation of environmental assessment so long as the agency does not substitute the contractor's judgment for its own), overruled on other grounds by Village of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970, 973 (10th Cir. 1992) (en banc); 40 C.F.R. § 1500.3 ("[I]t is the [CEQ]'s intention that any trivial violation of these regulations not give rise to any independent cause of action."). Therefore, when an EIS is challenged on the basis of an alleged conflict of interest that is known to the agency, we agree with the district court "that the Court can evaluate the oversight that the agency provided to the environmental impact statement process as a factual matter and make a determination upholding the environmental impact statement." Appellant's App. at 70. [7]

The record on appeal indicates that CDOT exercised substantial supervision over the preparation of the EIS. Even after CDOT hired the Contractor, CDOT

[7]We disagree with plaintiff that the rule adopted by the district court fails to promote the conflict of interest provision's goal of preserving public faith in the integrity of the NEPA process. See Appellant's Reply Br. at 10 (citing Guidance Regarding NEPA Regulations, 48 Fed. Reg. at 34,266). When an agency is integrally involved in the preparation of an EIS, that involvement diminishes the threat posed by any potential conflicts of interest because the agency then has the opportunity to direct the analysis and supplement areas it deems deficient. When agencies take such an active role, public perception concerning the integrity of the process is necessarily strengthened, even when the Contractor performs future work on the project. Indeed, recent legislation indicates that Congress shares this view. See Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 1205, 112 Stat. 107, 184-85 (1998).

continued to perform all management activities and only used the Contractor's personnel for technical expertise or to supplement staff where there was insufficient manpower. Consequently, CDOT managers made all major decisions and the Contractor's representatives reported to those managers, sometimes on a daily basis, to receive direction. In addition, CDOT prepared, without the Contractor's assistance, those sections of the EIS addressing noise impacts, air quality, wetlands, threatened and endangered species, paleontological resources, hazardous waste materials, vegetation, botanical and wildlife habitat, and historic resources. Finally, CDOT independently and extensively reviewed all of the Contractor's analyses, commented on the Contractor's field data and written product, noted deficiencies in the data and analysis, gave direction to the Contractor's work, and frequently required the Contractor to gather more facts or perform supplemental analysis on aspects of the project. To the extent that we are able to review the district court's findings in the absence of the entire administrative record, we are convinced that the degree of supervision exercised by CDOT protected the integrity and objectivity of the EIS in this case. [8]

---

[8]Plaintiff continues to rely on the Contractor's belated filing of the required disclosure statement as grounds for invalidating the EIS. Although we agree with the district court that it was a violation of the NEPA regulations to file the disclosure statement after the final EIS had been issued, see Forty Questions, 46 Fed. Reg. at 18,031 (noting that the purpose of the conflict provision is to screen out contractors with conflicts of interest prior to beginning the EIS), we conclude

(continued...)

## B.  Reasonable Alternatives

At "the heart of the environmental impact statement" is the obligation of the lead agency to review "all reasonable alternatives" to the proposed action.  40 C.F.R. § 1502.14.  To fulfill that obligation, "federal agencies must '[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.'"  All Indian Pueblo Council v. United States, 975 F.2d 1437, 1444 (10th Cir. 1992) (quoting 40 C.F.R. § 1502.14(a)).  The agency is not required to evaluate "the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." Id. (quotation omitted).  We review an EIS under a "rule of reason" standard to determine "'whether the statement is a good faith, objective, and reasonable presentation of the subject areas mandated by NEPA'" and whether the discussion of alternatives in the EIS is sufficient to permit a reasoned choice among the options.  Id. (quoting Manygoats v. Kleppe, 558 F.2d 556, 560 (10th Cir. 1977)).

_____

[8](...continued)
that the late filing does not require reversal.  The record demonstrates that the disclosure was filed prior to the Record of Decision, that it was reviewed as soon as it came in, and that it was found to be accurate and satisfactory.  Given the extensive supervision by CDOT and given the agency's evaluation of the disclosure upon its filing, we conclude it is not appropriate to invalidate the EIS on the basis of the late disclosure.  See 40 C.F.R. § 1500.3; cf. Busey, 938 F.2d at 202 (remanding to agency for execution of an appropriate disclosure statement and, if conflict found, for agency to determine appropriate measures to be taken).

We are not to substitute our judgment for that of the agency's; we may only determine whether the necessary procedures have been followed.    See id. at 1445.

Plaintiff asserts that the EIS is fatally defective because it fails to consider mass transit independently as a reasonable alternative to the construction proposal selected by defendants. [9]  We disagree.  Although definition of the term reasonable is not self-defining,   see Busey, 938 F.2d at 196, it is clear an agency need not independently evaluate alternatives it determines in good faith to be ineffective as a means to achieving the desired ends,     see All Indian Pueblo Council   , 975 F.2d at 1444; North Buckhead Civic Ass'n v. Skinner     , 903 F.2d 1533, 1543 (11th Cir. 1990) (holding mass transit alternative properly eliminated because it did not resolve the congestion problem targeted by the agencies involved).  Defendants' goal for the instant project is to relieve "[e]xtreme congestion . . . in the portion of Parker Road within the project area."  Appellees' Supp. App., Ex. B, vol. 1, at 1-3.  Having reviewed both the EIS and the ROD, as well as the portions of the

---

[9]Plaintiff argues that defendants admit that mass transit is a reasonable alternative in the final EIS.    See Appellant's Br. at 23.  This argument is without merit.  Appendix A of the EIS, to which plaintiff points for support, identifies "feasible" congestion management strategies,    see Appellees' Supp. App., Ex. B., vol. 2, at A-1 to A-2; it does not state that any such strategies would be a reasonable solution to the targeted problem—i.e., extreme traffic congestion on Parker Road at the I-225 interchange.    See id., vol. 1, at 1-3.  Moreover, defendants have consistently maintained the position that the EIS did not consider mass transit as an independent alternative because it was not a reasonable solution to the stated problem.

administrative record submitted on appeal, we conclude defendants reasonably rejected the mass transit alternative on the basis that it would not ameliorate the congestion problem in the project area.     See, e.g. , id. at E-2 ("Heavy congestion in the project area will hamper use of alternative modes of travel as well as motor vehicles, making this interchange less viable for transit in the future if improvements are not made.");     id. at 1-18 (noting that a Light Rail Transit alternative "would not negate the need for this proposed project");     id., vol. 2, at B-2 (noting that additional bus service to the surrounding neighborhoods "would not address the significant portion of vehicles" traveling through the project area); id., Ex. C., at A-8, A-12 to A-13 (same).  We are therefore forced to agree with the district court that defendants "satisfied the hard look, reasonableness standard of NEPA." Appellant's App. at 56.     [10]

---

[10]We do not mean to suggest that plaintiff could not have supported a NEPA claim by showing that defendants' decision to reject mass transit was ill-informed or contrary to the evidence in the administrative record.     See North Buckhead , 903 F.2d at 1543 (upholding EIS in which agency failed to address no build/heavy rail alternative primarily because scientific data in the administrative record demonstrated that existing streets would not be able to accommodate future traffic volumes).  Because plaintiff has failed to submit the entirety of the administrative record for our review, however, we are simply unable to review its claim that the administrative record is insufficient to support the agency's conclusion on that point.

**III**

Plaintiff's final argument on appeal is that defendants failed to comply with § 4(f) of the Transportation Act by failing to consider "prudent and feasible" alternatives to the use of 29 acres of publicly owned parkland. 49 U.S.C. § 303(c)(1). In evaluating alleged violations of the Transportation Act, we engage in a three-tiered inquiry established by the Supreme Court in <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402 (1971). First, we determine "whether the Secretary acted within the scope of his authority." <u>Id.</u> at 415. In that inquiry, "the reviewing court must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems." <u>Id.</u> at 416. Next, we must determine that the Secretary's decision to authorize the project was not "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" <u>Id.</u> (quoting 5 U.S.C. § 706(2)(A)). To make this determination, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." <u>Id.</u> The court, however, "is not empowered to substitute its judgment for that of the agency." <u>Id.</u> Finally, we must determine "whether the Secretary's action followed the necessary procedural requirements." <u>Id.</u> at 417. According to plaintiff, the district court erred because structural mass

-19-

transit is both feasible and prudent, and defendants improperly refused to consider whether mass transit would obviate the need to use publicly owned lands.

Because we have already concluded that defendants did consider mass transit during the preparation of the EIS, the only claim left for our review is whether mass transit constitutes a "prudent and feasible" alternative to construction. Although there appears to be no dispute that mass transit is, at a minimum, feasible, we nevertheless conclude that defendants could properly dismiss that alternative as imprudent. Whether an alternative is "prudent" for purposes of the Transportation Act "involves a common sense balancing of practical concerns, but § 4(f) requires the problems encountered by proposed alternatives to be 'truly unusual' or 'reach[] extraordinary magnitudes' if parkland is taken." Committee to Preserve Boomer Lake Park v. Department of Transp., 4 F.3d 1543, 1550 (10th Cir. 1993) (quoting Overton Park, 401 U.S. at 413). Nevertheless, an alternative that does not solve existing or future traffic problems, such as the congestion problem at issue in this case, may properly be rejected as imprudent. See id. (citing Lake Hefner Open Space Alliance v. Dole, 871 F.2d 943, 947 (10th Cir. 1989)). Because we have already concluded that defendants reasonably rejected the mass transit alternative on the ground that it fails to ameliorate the congestion problem in the project area, we conclude that this alternative is imprudent for purposes of the Transportation Act. We have

closely examined the final EIS, the ROD, and the portions of the administrative record submitted for our review, and we conclude that the decision to construct improvements in the project area "was based on a consideration of the relevant factors" and followed "necessary procedural requirements." Overton Park , 401 U.S. at 416-17.

## IV

We are not unsympathetic to plaintiff's position. Nevertheless, controlling precedent dictates that we not evaluate the wisdom of the decision to construct improvements at Parker Road. See Overton Park , 401 U.S. at 416; All Indian Pueblo Council , 975 F.2d at 1445. To the extent we are able to review the decision of the district court without the entirety of the administrative record, we must conclude that defendants adequately complied with the requirements of NEPA, its implementing regulations, and the Transportation Act. Accordingly, the judgment is **AFFIRMED.**