**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 15, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

AMERICAN WILD HORSE
CAMPAIGN; ANIMAL WELFARE
INSTITUTE; WESTERN WATERSHEDS
PROJECT; CAROL WALKER; CHAD
HANSON; KIMERLEE CURYL,

      Petitioners - Appellants,

and

FRIENDS OF ANIMALS, a 501(c)(3)
organization; RETURN TO FREEDOM, a
nonprofit organization; FRONT RANGE
EQUINE RESCUE, a nonprofit
organization; MEG FREDRICK;
ANGELIQUE REA,

      Petitioners,

v.

JON RABY, Acting Bureau of Land
Management Director, in his official
capacity; DOUGLAS J. BURGUM,
Secretary of the Department of the Interior,
in his official capacity; BUREAU OF
LAND MANAGEMENT; KIMBERLEE
FOSTER, Bureau of Land Management
Rock Springs Field Office Manager, in her
official capacity,

      Respondents - Appellees,

and

No. 24-8055

STATE OF WYOMING; ROCK
SPRINGS GRAZING ASSOCIATION, a
Wyoming corporation,

      Intervenor Respondents - Appellees.

_____

RETURN TO FREEDOM; FRONT
RANGE EQUINE RESCUE, a nonprofit
organization; MEG FREDRICK;
ANGELIQUE REA; RETURN TO
FREEDOM, a nonprofit organization,

      Petitioners - Appellants,

and

AMERICAN WILD HORSE
CAMPAIGN; ANIMAL WELFARE
INSTITUTE; WESTERN WATERSHEDS
PROJECT; CAROL WALKER; CHAD
HANSON; KIMERLEE CURYL;
FRIENDS OF ANIMALS, a 501(c)(3)
organization,

      Petitioners,

v.

JON RABY, Acting Bureau of Land
Management Director, in his official
capacity; DOUGLAS J. BURGUM,
Secretary of the Department of the Interior,
in his official capacity; BUREAU OF
LAND MANAGEMENT; KIMBERLEE
FOSTER, Bureau of Land Management
Rock Springs Field Office Manager, in her
official capacity,

      Respondents - Appellees,

and

No. 24-8056

2

STATE OF WYOMING; ROCK
SPRINGS GRAZING ASSOCIATION, a
Wyoming corporation,

      Intervenor Respondents - Appellees.

_____

FRIENDS OF ANIMALS, a 501(c)(3)
organization,

      Petitioner - Appellant,

and

AMERICAN WILD HORSE
CAMPAIGN; ANIMAL WELFARE
INSTITUTE; WESTERN WATERSHEDS
PROJECT; CAROL WALKER; CHAD
HANSON; KIMERLEE CURYL;
RETURN TO FREEDOM, a nonprofit
organization; FRONT RANGE EQUINE
RESCUE, a nonprofit organization; MEG
FREDRICK; ANGELIQUE REA,

      Petitioners,

v.

JON RABY, Acting Bureau of Land
Management Director, in his official
capacity; DOUGLAS J. BURGUM,
Secretary of the Department of the Interior,
in his official capacity; BUREAU OF
LAND MANAGEMENT; KIMBERLEE
FOSTER, Bureau of Land Management
Rock Springs Field Office Manager, in her
official capacity,

      Respondents - Appellees,

and

No. 24-8057

3

STATE OF WYOMING; ROCK
SPRINGS GRAZING ASSOCIATION, a
Wyoming corporation,

      Intervenor Respondents - Appellees.

_____

**Appeals from the United States District Court
for the District of Wyoming
(D.C. No. 2:23-CV-00084-KHR)**

_____

William S. Eubanks II (Matthew R. Arnold, with him on the briefs), Eubanks &
Associates, PLLC, Washington, DC, for Petitioners-Appellants.

Jennifer Best (Adam Kreger, with her on the briefs), Friends of Animals, Wildlife Law
Program, Centennial, Colorado, for Petitioner-Appellant Friends of Animals.

Bruce A. Wagman, Riley Safer Holmes & Cancila LLP, San Francisco, California, for
Petitioners-Appellants Return to Freedom, Front Range Equine Rescue, Meg Frederick,
and Angelique Rea.

Ezekiel A. Peterson, Attorney (Todd Kim, Assistant Attorney General; Lisa Lynne
Russell, Deputy Assistant Attorney General; and Thekla Hansen-Young, Attorney, with
him on the briefs), Environment & Natural Resources Division, United States
Department of Justice, Washington, DC, for Respondents-Appellees.

Danielle R. Bettencourt (Constance E. Brooks, with her on the briefs), Fairfield &
Woods, P.C., Denver, Colorado, for Intervenor Respondent-Appellee Rock Springs
Grazing Association.

Gregory Weisz, Senior Assistant Attorney General, Wyoming Attorney General's Office,
Cheyenne, Wyoming, for Intervenor Respondent-Appellee State of Wyoming.

_____

Before **HARTZ**, **TYMKOVICH**, and **EID**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

4

The Bureau of Land Management manages several herds of wild horses in southern Wyoming. Under the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–40, wild horses and burros—"living symbols of the historic and pioneer spirit of the West—" are federally protected and managed on public ranges. § 1331.

Many of these herds are managed on checkerboard land. Wyoming's checkerboard is a pattern of land ownership that alternates between public and private land every square mile. Since 1979, BLM managed wild horses on the checkerboard with consent from the private landowners. But beginning in 2010, when the private landowners revoked that consent, BLM found maintaining herds on the checkerboard increasingly untenable.

Recognizing these changed circumstances, in 2022, BLM amended its Regional Management Plan (RMP) to change two Herd Management Areas (HMAs) to Herd Areas (HAs). The new plan reduced the wild horse population goal in two areas to zero horses, and in another area reduced the goal by as much as 56 percent.

Three groups of petitioners challenge those amendments. They argue that the amendments: (1) violate the Wild Free-Roaming Horses and Burros Act by functionally eliminating wild horse herds on public lands without considering the statutory goal; (2) violate the National Environmental Policy Act (NEPA) by disregarding reasonable alternatives; and (3) violate the Federal Land Policy and Management Act (FLPMA) by failing to manage the land for multiple uses. The government responds that this decision does not implicate the Wild Horse Act

5

because it is a multiple-use management decision under FLPMA and that it is otherwise compliant with NEPA and FLPMA.

We agree with the Petitioners. While the Wild Horse Act does not require BLM to manage for wild horses to the detriment of all other uses, it does require that BLM "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Since BLM admitted that it did not consider ecological balance when amending the RMP, the plan failed to consider an important aspect of the Wild Horse Act. Although the law does not necessarily require a detailed discussion of ecological balance, BLM must explain that the decision does not undermine the statutory goal of achieving and maintaining ecological balance.

For that reason, we **REVERSE** and **REMAND**.

## I.    Background

### A.    Statutory Scheme

Congress passed the Wild Free-Roaming Horses and Burros Act in 1971. *See* 16 U.S.C. §§ 1331–40. The Wild Horse Act placed wild horses and burros under federal protection and required BLM to manage them on public ranges. § 1331. Under the original language of the act, wild horses were declared "an integral part of the natural system of the public lands." *Id.* As such, they were given near-maximum protection. *See Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1315–17 (D.C. Cir. 1982).

Congress then passed the Federal Land Policy and Management Act of 1976. FLPMA provided a general policy that the Secretary of the Interior shall "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). BLM balances all potential uses of public lands through RMPs. RMPs are a preliminary step in the management process. They are not themselves decisions to act, but instead "guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004) (quoting 43 CFR § 1601.0–2 (2003)). RMPs are the statement of priorities which guide multiple-use management for a given area.

In the years following enactment of the Wild Horse Act, populations exploded, and excess horses and burros began to damage their habitats. Congress amended the Act in 1978 to provide BLM authority to manage excess populations and harmonize it with FLPMA. The 1978 Amendments authorized BLM to remove "excess" horses if they "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

The 1978 Amendments still require the BLM to protect and manage wild horses, but not to the detriment of public or private lands. These competing demands are codified as the Wild Horse Act's Section 3 and Section 4 mandates. Section 3 requires that "[t]he Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance

7

on the public lands." Wild Free-Roaming Horses and Burros Act, § 3(a), 16 U.S.C. § 1333(a). Section 4 provides that "[i]f wild free-roaming horses or burros stray from public lands onto privately owned land, the owners of such land may inform the nearest Federal marshall or agent of the Secretary, who shall arrange to have the animals removed." *Id.* § 4, 16 U.S.C. § 1334. Since wild horses constantly move on and off private and public land on the checkerboard, complying with both commands is particularly difficult.

### B.   *Wyoming's Wild Horses*

To finance the Transcontinental Railroad, Congress created a corridor extending 20 miles north and south of the railroad's proposed route. The corridor was surveyed first into six-square-mile townships, then into square mile sections. Every other square mile was given to the railroad company as they built the track, and the federal government kept the other half to sell and finance the project. But in arid southern Wyoming, the sections were not valuable enough to sell on their own, so the checkerboard pattern exists to this day. *See Iron Bar Holdings, LLC v. Cape*, 131 F.4th 1153, 1158–59 (10th Cir. 2025) (describing the checkerboard in detail).

BLM manages several wild horse herds in southern Wyoming. To manage them, BLM created two different land designations. HAs are the areas that were used as habitat by wild horses or burros in 1971 when the Wild Horse Act was passed. These areas are eligible for wild horse herds, but not actively managed for that use. HMAs, on the other hand, are the areas that BLM has designated for active horse population management. Within an HMA, the BLM sets an appropriate management

8

level—the target population range. BLM calculates the appropriate management level by considering the available forage and water on public lands, only considering private lands if the landowner has granted written permission. The appropriate management level for an HA is zero.

At issue are three HMAs: Great Divide Basin, Salt Wells Creek, and Adobe Town HMAs. Each of these three areas contains significant checkerboard land, as shown in this map.



Map ES-1: Planning Area Resource Management Plan Amendment for Wild Horse Management

App., Vol. 2 at 63. Most of the private parcels on the checkerboard are owned by the Rock Springs Grazing Association. Since 1979, wild horses have roamed across the checkerboard with permission from the Grazing Association.

10

This permission is vital to wild horse management on the checkerboard.  Wild horses occupy home ranges of up to 117 square miles and travel between five and 17.5 miles each day.  This means that when wild horses are on checkerboarded land, they constantly move back and forth across public and private land.  Private landowners are prohibited from fencing their land and preventing feral horses or other wildlife from passing through.  *U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1508–09 (10th Cir. 1988).  Without landowner consent, Section 4 requires BLM to constantly remove wild horses from private land.

### C.    *Prior litigation and* Jewell

BLM's wild horse management on the checkerboard has a long history of litigation.  The Grazing Association sued BLM in 1979 when horse populations greatly exceeded the agreed-upon levels and again in 1985 to enforce the judgment from that case.  The State of Wyoming sued in 2003, again to force BLM to address overpopulation.  BLM entered into a consent decree to gather and remove excess horses but failed to do so.

Finally, in 2010, the Grazing Association requested that BLM remove all horses from the private lands within the checkerboard and revoked consent to manage wild horses on private checkerboard lands.  The government explained that it lacked funds to gather the horses in 2011 and would not prioritize the request until 2012.  The Grazing Association sued, and the litigation resulted in a consent decree which required BLM to remove all wild horses from private lands but included the Grazing Association's consent for a smaller number of horses to remain on the HMAs that

11

included Grazing Association land. Over objections from wild-horse advocacy groups, including a petitioner in this case, the district court approved the consent decree. The resulting 2013 removal, or gather, brought the HMAs to appropriate populations but failed to remove all horses from private lands. The Grazing Association and Wyoming objected, and BLM conducted another gather in 2014 removing horses from both the public and private sections of the checkerboard.

Wild-horse advocates, including some petitioners in this case, sued BLM, claiming that the 2014 gather violated the Wild Horse Act, FPLMA, and NEPA. The district court upheld BLM's decision, but we reversed. We held that despite the "practical realities" of the checkerboard, BLM "must abide by the plain terms of Section 3" when removing wild horses from public land. *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1188 (10th Cir. 2016). Put plainly, we held that BLM's Section 4 obligations do not void its Section 3 obligations.

We also recognized the need for BLM to find a "workable solution" to the problems on the checkerboard. In a footnote, we suggested "[p]erhaps the solution can come in the form of amendments to the areas designated as HMAs." *Id.* at 1189 n.8. Judge McKay, concurring, emphasized this point:

> It seems to me that the only way the BLM can ultimately lawfully achieve its Section 3 duty to maintain wild herds and prevent destruction of viability caused by over grazing on public lands is to go back to step one and make appropriate judgments by redetermining the HMAs without the non-permissive use of private lands.

*Id.* at 1192 (McKay, J., concurring).  But we recognized that these changes still "may have little effect" and "the ultimate solution must come from Congress."  *Id.* at 1189 n.8.

### D.      *Resource Management Plan Amendments*

BLM took this court's advice and proposed RMP amendments to address the management issues on the checkerboard.  Consistent with FLPMA and NEPA, BLM published first a draft environmental impact statement (EIS) and then a Final EIS.  The amendments' stated purpose was to "identify and select, consistent with applicable law, a plan for wild horse management, including [appropriate management levels], on the current HMAs that include checkerboard land."  App., Vol. 2 at 74.  The Final EIS considered four alternatives in detail and selected Alternative D.  The proposed amendment would revert Great Divide Basin and Salt Wells Creek HMAs to HA status and set the appropriate management level to zero horses.  Adobe Town HMA would be split.  The northwest portion containing the checkerboard would revert to HA status, but the southern portion containing mostly public lands would remain an HMA and would be managed for 259–536 wild horses.

The Final EIS and Record of Decision (ROD) explained why BLM believed Alternative D "best addresses the Purpose and Need for the [RMP] [A]mendment, is technically capable of implementation, and accomplishes a balance of multiple-use values by maintaining a wild horse herd in a portion of the planning area."  App., Vol. 3 at 264.  In its rationale, BLM explained that it could not maintain horse herds in the solid blocks of public land within Great Divide Basin or Salt Creek Wells

without constant straying onto private checkerboard land.[1]  It explained that other alternatives would harm mule deer and sage grouse, would not provide balanced multiple-use management, or were infeasible without private landowner consent.

### E.    District Court Proceedings

Three groups of petitioners sued, challenging the RMP amendments under the Wild Horse Act, NEPA, and FLPMA.  The district court consolidated the issues and ruled for BLM.  First, it held that any challenge to BLM's decision to remove horses was unripe.  On the merits, the district court found that BLM had not acted arbitrarily or capriciously in reverting the HMAs to HAs.

All three groups of petitioners appealed to us.  We consolidated their appeals.

## II.    Discussion

Petitioners contend that BLM lacks the statutory authority to completely eliminate two herd management areas unless it is impossible to maintain thriving natural ecological balance.  They argue that the Wild Horse Act creates a duty to manage wild horses on public lands, and that BLM may remove them only based on ecological considerations.  In the alternative, they argue that BLM violated NEPA by predetermining its decision, failing to consider land swaps, and failing to consider the environmental impacts of increased grazing.  Finally, Return to Freedom argues that BLM violated FLPMA by considering only benefits to grazing.  We address these arguments in turn.

---

[1] Adobe Town HMA has an existing boundary fence that allows BLM to prevent straying onto checkerboard land.

### A.    Standard of Review

None of the statutes at issue provide petitioners with a cause of action, so they bring suit under the Administrative Procedure Act.  Under the APA, "[a]n agency's decision is arbitrary and capricious if the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made 'a clear error of judgment.'"  *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting *Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007)).

### B.    The Wild Free-Roaming Horses and Burros Act

Petitioners fault the district court for failing to make the threshold determination of whether Congress authorized BLM to take this action.  So we begin with "the question that matters: Does the statute authorize the challenged agency action?"  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 406 (2024).

The parties offer us two competing interpretations of the Wild Horse Act. Petitioners contend that Section 3(a) of the Wild Horse Act requires BLM to preserve horse populations so long as they can maintain a thriving natural ecological balance. In their reading, Section 3(a) mandates that "[t]he Secretary *shall* manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands."  16 U.S.C. § 1333(a)

15

(emphasis added).  Petitioners argue that thriving natural ecological balance is the only legitimate reason that BLM may remove wild horses from public lands.  Even then, it must follow the procedures in Section 3(b) to make an "excess" determination before removing horses.[2]  § 1333(b).

BLM, alongside the State of Wyoming and Rock Springs Grazing Association as intervenors, argue instead that their management duty is much more limited.  The government emphasizes that the Secretary is instructed to manage wild horses "as components of the public lands."  § 1333(a).  Under this reading, wild horse management is just one of many appropriate uses for public lands, and FLPMA "does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required."  *Richardson*, 565 F.3d at 710.  Against this backdrop, BLM argues that whether to manage wild horses in a specific area is a "Step Zero" decision under FLPMA.  Only once it designates an area for horse management must BLM consider thriving natural ecological balance.

We agree with the government that the Wild Horse Act should be read in concert with FLPMA.  The full text of the statute provides crucial context that

---

[2] The Petitioners also argue that by zeroing out the appropriate management levels of two HMAs, this is effectively a removal decision, and one that does not conform with Section 3(b).  We agree with the district court that this claim is unripe.  BLM must prepare a separate gather plan to remove the horses.  Since there must still be a specific removal decision, the site-wide plan is not the appropriate time to challenge removal.  *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

plaintiffs' narrow reading ignores.  Section 3 of the Wild Horse Act reads in relevant part:

> All wild free-roaming horses and burros are hereby declared to be under the jurisdiction of the Secretary for the purpose of management and protection in accordance with the provisions of this chapter.  *The Secretary is authorized and directed to protect and manage wild free-roaming horses and burros as components of the public lands*, and he may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation, where the Secretary after consultation with the wildlife agency of the State wherein any such range is proposed and with the Advisory Board established in section 1337 of this title deems such action desirable. *The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands.*

16 U.S.C. § 1333(a) (emphases added).  The primary authorization and command is to "protect and manage wild free-roaming horses and burros as components of the public lands." *Id.*  And public lands are managed "under principles of multiple use and sustained yield."  43 U.S.C. § 1732(a).

Petitioners' suggested reading would elevate wild horse management above other uses, but "[i]t is past doubt that the principle of multiple use does not require BLM to prioritize [one use] over other uses." *Richardson*, 565 F.3d at 710.  In *Richardson*, we explained that "BLM's obligation to manage for multiple use does not mean that development *must* be allowed on the Otero Mesa.  Development is a *possible* use, which BLM must weigh against other possible uses." *Id.*  Like development, wild horse management is a *possible* use, not one that *must* be allowed.

17

The 1978 Amendments to the Wild Horse Act confirm this interpretation. The D.C. Circuit, in *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310 (D.C. Cir. 1982), held that the 1978 amendments clarified the balance between protecting wild horses and other competing interests. 694 F.2d at 1316–17. By adding the definition of excess horses and providing for their removal, Congress "ma[de] explicit what was, at most, implicit in the 1971 Act: public ranges are to be managed for multiple uses, not merely for the maximum protection of wild horses." *Id.* at 1317.

We agree that the text and context of the Wild Horse Act contradict Petitioners' reading. Wild horses are not to be managed at the expense of all other public land uses, but instead as a component of the multiple uses envisioned for these lands.

But this does not mean BLM can use the resource management plan process to avoid its obligations under the Wild Horse Act. BLM argues that the ecological balance standard does not apply to RMP decisions. It argues that this is not a *management* decision, but a "precursor question of which areas of the public lands should be managed for wild horses" to which the Wild Horse Act does not apply. Federal Aple. Br. at 42.

This argument is too clever by half. Section 3 still requires BLM to manage horse herds "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). While this is not the absolute command Petitioners suggest, it is still the touchstone of wild horse management. When making wild horse management decisions, BLM must consider

18

whether their decisions achieve and maintain thriving natural ecological balance. And the decision as to which areas of the public lands should be managed for wild horses *is* a management decision. *See Manage*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/manage (last visited July 1, 2025) (defining manage as "to exercise executive, administrative, and supervisory direction"); *see also Manage*, *Black's Law Dictionary* (12th ed. 2024) (defining manage as "[t]o exercise executive, administrative, and supervisory powers"). It would be unwise to determine what areas are fit for wild horse management without reference to the goal of wild horse management. Any other interpretation would allow BLM to use the RMP process to skirt its Wild Horse Act obligations.

BLM has only a modest duty: consider whether, under multiple-use principles, it can manage wild horses in a manner that achieves and maintains thriving natural balance. Here, it did not do that. At oral argument, the government admitted it made no finding of thriving natural ecological balance, because it believed it did not need to. Oral Argument at 27:12–32:12. This tracks statements in the EIS and ROD that specifically disclaim a finding of thriving natural ecological balance. BLM candidly admitted "the analysis in this document does not focus on whether existing range conditions reflect a thriving natural ecological balance." App., Vol. 2 at 74; *see also* App., Vol. 3 at 221 ("[T]he analysis does not focus on whether existing range conditions reflect a [thriving natural ecological balance] as described in the [Wild Horse Act].").

Ignoring thriving natural ecological balance, a requirement of the Wild Horse Act, makes BLM's decision arbitrary and capricious under the APA. BLM both "entirely failed to consider an important aspect of the problem" and "failed to base its decision on consideration of the relevant factors." *Richardson*, 565 F.3d at 704.

### C.    NEPA

Petitioners also challenge BLM's decision under NEPA. They make three claims: (1) BLM predetermined its decision; (2) BLM failed to properly consider land swaps; and (3) BLM did not consider the environmental impacts of increased grazing. Each argument fails.

NEPA does not require any substantive outcome; it merely imposes procedural requirements. *Richardson*, 565 F.3d at 704. Our only role is to "confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. ---, 2025 WL 1520964, at *6 (2025). This is, by nature, a narrow review— "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at *9.

*First,* Petitioners claim that BLM predetermined its outcome. They argue that because the RMP Amendments stem from the Grazing Association's revocation and follow the 2012 consent decree, BLM's only goal was to meet the Grazing Association's demands.

This argument does not "meet [the] high standard to prove predetermination." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010).

True, the RMP Amendments may be designed to accomplish the same goals as the 2012 consent decree, but we have held that "[a]n agency can have a preferred alternative in mind when it conducts a NEPA analysis." *Id.* at 712. Agencies often have goals when they propose actions. But preferred alternatives are predetermined only "when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis." *Id.* at 714.

Petitioners do not point to any actions that suggest BLM had committed to removing horses prior to completing the EIS. The Petitioners argue only that, because the process was triggered by the Grazing Association's 2012 lawsuit and subsequent consent decree, the BLM tipped its hand before the process. But the 2012 consent decree no longer binds BLM after we invalidated it in *Jewell*. 847 F.3d at 1188. Nor are we convinced that BLM did not undertake its review in good faith. The agency defined its goal broadly: "[t]he purpose of this planning effort is to identify and select, consistent with applicable law, a plan for wild horse management, including [appropriate management level], on the current HMAs that include checkerboard land, in the Rock Springs Field Office and a portion of the Rawlins Field Office." App., Vol. 2 at 74. BLM then considered both a no-action alternative and alternatives that maintained the same number of horses on only public land. It concluded these alternatives did not meet its objectives. Ultimately, Petitioners cannot show that BLM committed to any outcome before the NEPA process or that the process was somehow deficient.

*Second*, Petitioners challenge the EIS's alternatives analysis. They claim that BLM did not fully consider land swaps—trading checkerboard land to consolidate federal land for wild horse management.

When performing an alternatives analysis, federal agencies must rigorously explore all reasonable alternatives and briefly explain why other alternatives are dismissed as unreasonable. *Ass'ns Working for Aurora's Residential Env't (AWARE) v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1130 (10th Cir. 1998). When the agency "decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Seven Cnty.*, 2025 WL 1520964 at *7 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

BLM explained that it "does not currently have a proposal from a willing party (or group of parties) to a land exchange involving checkerboard lands in the planning area," and even if it did, "a land exchange would entail extensive surveys of millions of acres for mineral value, cultural resources, and potential hazardous materials, which would likely take years to complete and demand extensive agency resources." App., Vol. 2 at 86. Petitioners suggest that how quickly the alternative solves the problem should not matter. But whether an alternative is so slow and expensive as to be infeasible is the exact kind of "fact-dependent, context-specific, and policy-laden choice[] about the depth and breadth of [the EIS] inquiry" to which we owe

22

"substantial deference." *Seven Cnty.*, 2025 WL 1520964 at *8. Accordingly, we find BLM's explanation of why land swaps are infeasible to be reasonable.

*Finally*, Petitioners claim BLM ignored the environmental impacts of the potential of increased grazing. As the government explained in its response to Petitioners' supplemental authority, the Supreme Court foreclosed this argument in *Seven County*. *See* 2025 WL 1520964, *10. The Court ruled that "when the effects of an agency action arise from a separate project—for example, a possible future project or one that is geographically distinct from the project at hand—NEPA does not require the agency to evaluate the effects of that separate project." *Id.* Increased grazing is a separate project that cannot occur without a separate decision-making process subject to NEPA. So the environmental impacts should be assessed if and when BLM makes that decision. BLM acknowledged that where horses are removed, forage *could* be allocated to livestock, but the RMP Amendments do not themselves authorize any additional grazing. Just because these effects are foreseeable, does not mean BLM can be held responsible for these effects at this time. *Id.*

In sum, BLM complied with NEPA and took the requisite good faith "hard look." *See Richardson*, 565 F.3d at 704. Petitioners fail to show BLM irreversibly committed to a predetermined outcome and improperly determined land swaps were

infeasible.  And any concerns about the environmental impacts of increased grazing are beyond the scope of the RMP Amendments and our NEPA review.

### D.    FLPMA

We turn lastly to Return to Freedom's FLPMA argument.  Return to Freedom argues: (1) the RMP Amendment is inconsistent with BLM's multiple use mandate; and (2) removing the wild horses is itself undue degradation.  We disagree on both grounds.

We find BLM considered the balance of multiple uses.  The ROD explicitly states Alternative D "accomplishes a balance of multiple-use values by maintaining a wild horse herd in a portion of the planning area" and "provides the greatest overall benefit to resource values."  App., Vol. 3 at 264.  The EIS confirms that BLM considered each alternative's impact on various resources, including water, soil, vegetation, wildlife, fisheries, recreation, and livestock grazing.  *See* App., Vol. 2 at 126–65.

Moreover, BLM considered whether there would be undue degradation to the public lands.  Return to Freedom seemingly argues that removing wild horses is itself degradation.  This cannot be so.  As explained above, wild horses are just one component of the public lands.  And BLM recognized that reducing wild horses may have a positive effect on other components: "[t]he lower number of wild horses in the planning area is expected to have positive impacts to wildlife, soils, vegetation, livestock, and water resources."  App., Vol. 2 at 67.  Return to Freedom simply wants BLM to prioritize wild horse management, but FLPMA does not mandate that.  *See*

24

*Richardson*, 565 F.3d at 710 ("It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses."). In other words, changing the balance is not necessarily degradation.

In sum, we find BLM complied with FLPMA.

### E.    Remedy

Having concluded that BLM violated the APA by failing to explain its proposed decision under the Wild Horse Act, we now consider the appropriate remedy. The APA requires that we "set aside" unlawful agency actions. 5 U.S.C. § 706(2). Vacatur is typical, but not the exclusive remedy. *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1048 (10th Cir. 2023). In *Dine Citizens*, we affirmed that "when an agency action is supported by insufficient justification, the agency can either offer a fuller explanation of the agency's reasoning at the time of the agency action or take new agency action." *Id.* (citation modified). We applied the two-factor *Allied-Signal* test. *Id.* at 1049 (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). The *Allied-Signal* test requires courts to consider the practical consequences of vacatur: "(1) the seriousness of the agency action's deficiencies (and thus the extent of doubt whether the agency chose correctly), and (2) the disruptive consequences of an interim change that may itself be changed." *Id.* (citation modified).

Wyoming, intervening in support of BLM, argued that "the [thriving natural ecological balance] issue was the underlying motivating factor in the Bureau's determination to not manage the HAs for wild horses: it is obvious in the

25

checkerboard area a [thriving natural ecological balance] cannot be met without inclusion of the private lands." Wyoming Br. at 22 n.3. Without the forage and water of private checkerboard lands, the thriving natural ecological balance calculation has undoubtably changed, so there is "at least a serious possibility that the Commission will be able to substantiate its decision on remand." *Allied Signal*, 988 F.2d at 151.

Because the district court affirmed BLM's decision, it did not consider these factors. This is "a fact-intensive inquiry that is typically left to the discretion of the district court" that we do not typically consider in the first instance. *Id.* Instead, we remand to the district court to apply these factors and determine the appropriate remedy.

## III. Conclusion

In sum, BLM failed to explain whether its decision achieves and maintains a thriving natural ecological balance on the public lands. This renders its decision arbitrary and capricious because it failed to base its decision on the statutory requirement of the Wild Horse Act. We reverse and remand to the district court to apply the *Allied-Signal* factors and determine the appropriate remedy.